**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NATIONAL IRANIAN AMERICAN COUNCIL ACTION,
*Address filed under seal (LCvR 5.1(c)(1))*

Plaintiff,

v.

DONALD J. TRUMP, in his official capacity as President of the United States,
The White House
1600 Pennsylvania Avenue NW
Washington, DC 20500,

Defendant.

Civil Action No. ____________

**COMPLAINT FOR DECLARATORY RELIEF**

1. This is a civil action seeking a declaratory judgment that the offensive war that the defendant, the President of the United States, is waging against the Islamic Republic of Iran, which includes a blockade, violates Article I, section 8, clause 11 of the United States Constitution (the "Declare War Clause"). There has been no declaration of war by Congress or its legislative equivalent. As James Madison, father of the Constitution, elaborated in Helvidius 4, "In no part of the constitution is more wisdom to be found than in the clause which confides the question of war or peace to the legislature, and not to the executive department." That was the understanding of every participant in drafting, debating, and ratifying the Constitution, and it remains the correct understanding today.

2. On February 28, 2026, acting in collaboration with the State of Israel, the defendant unilaterally directed the Armed Forces of the United States to bomb the Islamic Republic of Iran. The bombing and other acts of war, such as a blockade, continue with no end in sight.

## PLAINTIFF

3. National Iranian American Council Action (NIAC Action) is the advocacy and civic engagement organization affiliated with the National Iranian American Council. Founded in 2015 and exempt from taxation under section 501(c)(4) of the Internal Revenue Code, NIAC Action works to build the political power of the Iranian American community by legislative advocacy, grassroots organizing, and public education. Its mission is to advance diplomacy, defend civil rights and liberties, and promote policies that enhance the security and well-being of both the Iranian American community and the United States.

4. As a membership organization, NIAC Action advocates for its members and supporters before Congress and the Executive Branch. Among other things, it seeks to prevent or to remedy unconstitutional wars, defend separation of powers, reform immigration policies, and find diplomatic solutions to conflicts involving Iran.

5. NIAC Action is suing on behalf of itself and its members. Many of its members have families in Iran. They are all in imminent danger of harm to their persons and properties proximately caused by the unconstitutional war waged by defendant President Donald J. Trump. The U.S. State Department, on September 1, 2026, issued a Level 4 travel advisory (the highest), declaring, "**Do not travel to Iran for any reason. U.S. citizens should leave Iran now.**" As a result of these wartime conditions, the lives and property of every Iranian inhabitant, including the families of plaintiff's members in Iran, are in imminent danger.

6. The families of members of NIAC Action currently living in Iran have been injured by the unconstitutional war and continue to be at risk of further imminent injury to their persons and/or property. The following examples are illustrative:

a. Member Nima Dilmaghani is a cousin of Mina Pourasad. During a recent bombing, Mina Pourasad was trapped under rubble and sustained serious injuries,

including a broken leg, the loss of her index finger, which was surgically reattached but has resulted in a loss of motion, as well as damage to her eardrums. She is currently undergoing rehabilitation and has experienced depression following the attack. The bombing also destroyed Mina Pourasad's apartment. In addition, the warehouse of the company where Mina Pourasad works was bombed, killing approximately ten of her coworkers and injuring approximately ten others. The continuation of the war against Iran presents an ongoing imminent threat of further physical and property harm to this relative and others in the family of member Dilmaghani.

b. Anonymous Member #1 is the grandchild of a woman in her late 80s who resides in Tehran. Member's grandmother is bedridden, unable to move independently, and dependent on an oxygen machine for her survival. During the attacks on Tehran, she could not be evacuated because of her dependence on oxygen and was forced to remain in her home during the bombing. Her neighborhood experienced additional bombings, including attacks on nearby residential areas, leaving her at risk and in extreme fear. Member's grandmother has no independent source of income and relies on family support for medication and medical care. Rising prices caused by the war have placed additional strain on her family and made it more difficult to afford her basic needs and medical treatment. Access to healthcare has also become more difficult as medical personnel have sought to abandon Tehran. In addition, power outages pose a potentially life-threatening risk because they can interrupt the electricity needed to operate her oxygen machine. Given Member's grandmother's medical condition and inability to evacuate, continued hostilities present a potentially imminent life-threatening danger to her.

c. Member Alan Band is a cousin of Hamid Alagheband, who resides in northern Tehran with his wife and son. During the unconstitutional war against Iran, Hamid and his family experienced the effects of nearby military strikes, including buildings and windows shaking from explosions. They also experienced repeated disruptions to their electricity and access to water, which interfered with basic activities including bathing, cooking, running water, and laundry. The proximity of the strikes to Hamid's home and the continuing disruptions to essential utilities will continue to expose member Band's family in Iran to an ongoing imminent risk of physical and property harm.

d. Member Kowsar Gowhari is the second cousin, once removed, of a 70-year-old woman who was killed by U.S. and Israeli strikes on Tehran. Member's second cousin was traveling in a car on Bagheri Highway in the passenger seat when a missile struck the fast lane of the highway. Due to the driver's condition in hospital, the family did not immediately know what had happened until seven hours later, when the driver recovered enough to notify the family.

Member Gowhari's remaining surviving family in Iran, which includes a niece of the deceased relative killed in the freeway blast who lives in Qom and other relatives, all of whom face severe continued hardships as a result of these lethal impacts of the war on their family. They relied on their deceased aunt significantly as a support system for the family and are facing severe emotional and mental challenges resulting from her loss. Member's remaining surviving relatives in Iran additionally face severe trauma from the loss of other family members during an attack on a nuclear scientist in their neighborhood in Qom. The niece of the relative killed in the freeway blast has additionally experienced major

interruptions to electricity because of the war's continued impacts on electrical and civilian power infrastructure.

e. Anonymous Member #2 owns an apartment used by his family in the town of Natanz, which is approximately 15 miles from the site of Iran's main nuclear enrichment complex that was bombed by the United States and Israel in both 2025 and 2026. Anonymous Member #2 fears both imminent future strikes that could affect his property and relatives in Iran, as well as ongoing environmental health risks of contamination from radiation related to the site. Anonymous Member's family apartment is also within the same general distance from the Pickaxe (Kolang) Mountain, which has been repeatedly threatened with "catastrophic bombing" (including with tactical nuclear weapons) both by the U.S. and Israel. In addition to the location of his apartment, which is at high risk of future bombardment, Anonymous Member's relatives are buried in an ancestral mausoleum in the same town, including his parents and other relatives, which is also at risk of imminent future bombardment potentially constituting war crimes.

f. Member Parveen Esmaeilzadeh's in-laws live in Iran under threat of bombing and continued strikes. Member's mother-in-law experienced airstrikes and bombings hitting very close to her apartment building in Tehran, causing damage and cracks in the foundation of her building. Member Esmaeilzadeh has young nieces and nephews who witnessed the blasts and are now experiencing severe PTSD and trauma. In addition, their education has been halted due to defendant's war. The war has also caused and continues to cause the Member Esmaeilzadeh's family severe economic hardship. The family owns a heating and air conditioning company, and energy prices resulting from the war's disruption of the world fuel supply have deeply harmed their business.

g. Anonymous Member #3's relative, spouse, and their young child reside in Tehran. They are afraid of how the war is shaping their child's psychological development. Shockwaves from a nearby blast shattered the windows of their apartment building, causing damage to their home. Walking around their neighborhood, there are craters in hollowed out buildings and in the streets from detonated bombs. Member #3's relative is a U.S. citizen, and their spouse is also a U.S. citizen. Like many Iranians, the war has put substantial financial strain on their family. Member's relative has a heart condition, and it has been extremely hard to procure his heart medication during the war. The damage to their home from nearby bombardment demonstrates the continuing danger that the war poses to Member #3's family, including the risk of further physical and property harm.

h. Anonymous Member #4's only siblings, two elderly sisters, live in Tehran and are experiencing numerous severe impacts of the war. Member's sisters have faced extreme difficulty in accessing medicines, food, and other essentials under the war's economic shutdown and numerous sanctions imposed by the U.S. Specifically, spiraling inflation in Iran caused by the U.S. blockade is cutting off access to the types of medicine they have been prescribed, and they are now priced out of access to their needed medications. Scarcity of numerous food items because of the war has also adversely affected their ability to meet their basic dietary needs regularly.

In addition to being cut off from food and medications, the member's sisters were recently attempting to travel to Armenia or Georgia in order to reunite with their brother since they are banned from visiting the U.S. However, during the week of September 7, 2026, newly announced U.S. airline sanctions completely shut down their ability to leave Iran or even return if they wanted to. Member's relatives are now effectively trapped in

Tehran along with millions of other Iranians living under the imminent threat of continued bombing and the fallout of the war's economic impacts.

Member's sisters live in the Niavaran neighborhood of Tehran, and his younger sister has been particularly adversely affected by the bombings. Niavaran is a neighborhood close to some of the high-profile leaders of the Iranian government's residences, and due to this proximity, she regularly fears collateral damage from airstrikes. The sister reports that within 1 kilometer there have been buildings bombed under pretense that IRGC leaders or officials live there. A police station near her home was also bombed, and she is afraid of both being struck by nearby continued bombs and also losing access to daily emergency services. Both sisters own their homes in Iran, and their property is at risk of damage or destruction from future continued airstrikes. In addition to bombardment, Member's sisters are experiencing power outages and lack of reliability to municipal water supply which has been attacked during the war. They are under incredible duress and mental anguish from the continuation of the war, as are Member's nieces and nephews who are the adult children of the younger sister, now with their own young adult children - uncertain whether they are the next target and if they will be killed. Member has severe anguish from being unable to verify whether they are safe and is distressed at being unable to address their daily situation.

**DEFENDANT**

7. The defendant Donald J. Trump is the President of the United States. He is sued in his official capacity for his actions directing the war against the Islamic Republic of Iran as set forth in this complaint. The defendant, as the President of the United States, is legally obligated by the Constitution, Article II, section 3, to abide by the judgments of the courts of the United States, including those granting the declaratory relief sought by plaintiff in this case. To flout a court

judgment, among other things, would be an impeachable offense under Article II, section 4 of the Constitution.

## JURISDICTION AND VENUE

8. Plaintiff's claim arises under Article I, section 8, clause 11 of the Constitution, and subject matter jurisdiction is based on 28 U.S.C. § 1331. Declaratory relief is authorized by 28 U.S.C. §§ 2201-02.

9. Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because the defendant is an officer of the United States sued in his official capacity who resides in this District, and a substantial part of the events or omissions giving rise to plaintiff's claim occurred in this District.

## SUMMARY OF WAR THAT DEFENDANT HAS WAGED AGAINST IRAN

10. Defendant's war against Iran is a war of aggression, not undertaken in self-defense. The Rome Statute of the International Criminal Court defines the crime of aggression to include

> "Bombardment by the armed forces of a State against the territory of another State or the use of any weapons by a State against the territory of another State; The blockade of the ports or coasts of a State by the armed forces of another State…"

Under Article 6(a) of the Charter of the post-World War II International Military Tribunal sitting at Nuremberg, crimes against peace were defined as the "planning, preparation, initiation or waging of a war of aggression, or a war in violation of international treaties…."

11. President Trump's war of aggression was initiated on February 28, 2026, in collaboration with an Israeli-conducted strike that killed Iran's head of state and a religious figure, Supreme Leader Ayatollah Ali Khamenei, at his residence amid a gathering with senior Iranian defense officials. The United States and Israeli militaries followed up with joint, intense strikes across Iran. According to the *Wall Street Journal,* "both the U.S. and Israel began attacking Iran's air defenses and other military infrastructure. The U.S. Navy launched Tomahawk cruise missiles

and Himars rockets, conducting strikes across southern Iran and taking out Iranian Navy ships, hitting more than 1,000 targets in the first 24 hours."

12. Defendant announced on the first day of this presidential war that "major combat operations in Iran" had begun. Among the military objectives declared by the defendant were earmarks of war, including his intent to "destroy [Iran's] missiles and raze their missile industry to the ground" and vows to "annihilate their Navy." The defendant also warned that U.S. service members would likely be killed or injured: "the Iranian regime seeks to kill. The lives of courageous American heroes may be lost, and we may have casualties. That often happens in war, but we're doing this not for now."

13. On February 28, the United States also bombed the Shajareh Tayyebeh elementary school in Minab, Iran, which was the largest civilian mass casualty event inflicted by the United States military since February 13, 1991. At least 156 civilians were killed in this strike, including 120 young children who were attending school.

14. On March 2, 2026, the defendant notified Congress of the initiation of hostilities against Iran, stating, "Although the United States desires a quick and enduring peace, it is not possible at this time to know the full scope and duration of military operations that may be necessary." Defendant's unconstitutional presidential war of aggression against Iran continues to this date and imminently threatens the lives, limbs, property, health, and/or survival of the families of plaintiff's members in Iran.

15. During the initial thirty-nine days of this war, the United States Armed Forces, at the direction of defendant, and without authorization from Congress, maintained an intense bombardment of Iran in a military operation called "Epic Fury." The United States Central Command (CENTCOM) claims that it struck 13,000+ targets as of April 6, 2026, and damaged or

destroyed more than 155 Iranian vessels. Involved in the operations were 26 different types of manned and unmanned aircraft, supported by aircraft carriers, submarines, destroyers, refueling and supply ships, various amphibious assault ships, several different surface to surface missile capabilities and – according to CENTCOM's fact sheet - "special capabilities we can't list here!" CENTCOM also claims to have targeted scores of Iranian military facilities.

16. On April 7, 2026, President Trump thundered on Truth Social, "A whole civilization will die tonight, never to be brought back again. I don't want that to happen, but it probably will." In a January 2026 interview with *The New York Times*, President Trump insisted that the sole constraint on his powers internationally was not the United States Constitution, but his "own morality."

17. Iran has struck back heavily throughout the war with thousands of missiles and drones fired at American and Israeli positions across the greater Middle East, including U.S. bases and diplomatic compounds in the United Arab Emirates, Saudi Arabia, Qatar, Bahrain, Kuwait and Jordan. At least eighteen U.S. service members have been killed in the war, and hundreds more have suffered serious injuries. The *Washington Post* reported September 18 that more American service members have died amid the ongoing Iran war than the Pentagon has disclosed publicly, with various officials claiming there have been 22 or 23 military fatalities amid the war.

18. Iranian retaliation did significant damage to American aircraft and U.S. bases across the region. According to *The New York Times*, "Many of the 13 military bases in the region used by American troops are all but uninhabitable, with the ones in Kuwait, which is next door to Iran, suffering perhaps the most damage…In Qatar, Iran struck Al Udeid Air Base, the regional air headquarters of U.S. Central Command, damaging an early-warning radar system. In Bahrain, a one-way Iranian attack drone struck communications equipment at the headquarters of the U.S.

Fifth Fleet. At Prince Sultan Air Base in Saudi Arabia, Iranian missiles and drones damaged communications equipment and several refueling tankers."

19. On April 8, 2026, the United States and Iran announced a ceasefire brokered by Pakistan and other nations. These diplomatic engagements led to the announcement of a "Memorandum of Understanding" aimed at ending the war, which was signed by the defendant's Vice President J.D. Vance on June 17, 2026.

20. Nonetheless, the war continued despite the announced ceasefire. On April 13, 2026, the United States commenced a naval blockade against vessels traveling to or from Iranian ports. The imposition of the blockade led to considerable tensions throughout the supposed ceasefire period, which included U.S. forces opening fire and disabling multiple ships seeking to cross the blockade line and strikes against "Iranian coastal surveillance radar sites in Goruk and on Qeshm Island to defend against further maritime attacks" and strikes targeting "Iranian military surveillance infrastructure, communication systems, air defense sites, drone storage facilities, and minelayer capabilities." On June 29, 2026, the President wrote to apprise the Congress of additional hostilities against Iran.

21. The alleged ceasefire broke down completely beginning July 7, 2026, leading to a continuation in full of the war that began February 28th. The United States alleged that Iran struck commercial ships in the Strait of Hormuz, and in response it launched new strikes against Iran. These entailed attacks on "over 80 targets with precision munitions." The defendant publicly described the memorandum of understanding as "over," and on July 10th he notified Congress of renewed hostilities against Iran. Strikes began again on a daily basis beginning on July 11, 2026, which triggered Iranian reprisal strikes on U.S. bases across the greater Middle East, causing significant damage. Subsequent U.S. strikes inside of Iran have included civilian structures,

including bridges, railroads and the maritime control tower in Chabahar. The U.S. also announced a resumption of a naval blockade on Iranian ports, which went into effect on July 14th. These U.S. attacks have continued to kill civilians and military personnel in Iran, and Iranian retaliation has taken the lives of U.S. soldiers in this unlawful continuation of the war.

22. The defendant has repeatedly recognized that the nation is at war, including in his initial announcement on February 28th. Additional recognitions include remarks at a NATO Summit where he stated that "the Iran war has been a tremendous military success," which the President then reshared via his Truth Social account. On April 26, 2026, the President declared on his Truth Social account "Israel never talked me into the war with Iran."

23. In order to prosecute defendant's war against Iran, the U.S. military has expended billions of dollars, and it has greatly reduced its stock of weapons available for future military uses. According to an analysis by the Center for Strategic and International Studies, Patriot missile interceptors have been reduced by two-thirds, from 2,330 before the war to as little as 759 in late July. Likewise, the U.S. stockpile of THAAD interceptors has been reduced by nearly half, from 452 before the war to as little as 234 in late July. Separate reports put the figures even lower, at an 80% reduction in THAAD interceptors. A U.S. official acknowledged that these stockpiles - utilized to defend against missile and drone threats both in the Middle East and across the globe - are now "extremely low." Additionally, more than 1,000 U.S. Tomahawk missiles were expended in the initial phase of the war, according to the Center for Strategic and International Studies, a depletion of roughly one-third of the pre-war stockpile. It will take years to replace many of these stockpiles of key offensive and defensive munitions, even if the war were to end today.

24. This extensive expenditure of key munitions in the war has factored into the Trump administration's supplemental budget request, sent to Congress on June 24, 2026. The request

includes $67.1 billion for the Department of Defense, on top of a $1.5 trillion appropriations request for Fiscal Year 2027. Of the $67.1 billion in additional funding, $21 billion is specifically requested for munitions. Recent reports from the military estimate that defendant's war cost $43.6 billion through September 3rd, with future expenditures projected at $2-$3 billion per month.

25. Analysis of polling data suggests more than 2-1 opposition among the American public to the presidential war of aggression against Iran. That opposition is shared by Congress. On June 3, 2026, the House of Representatives passed House Concurrent Resolution 86 in a 215-208 vote, supported by 4 Republicans and 211 Democrats, which states that "Congress directs the President to remove United States Armed Forces from hostilities against the Islamic Republic of Iran." The same resolution passed the Senate on June 23, 2026, in a 50-48 vote, with four Republicans voting in favor. A similar resolution passed the House of Representatives on September 15, 2026, by a vote of 220-204.

26. In an effort to avoid the constitutional consequences of his illegal war, the defendant has noted that he generally avoids using the term "war" to describe the war with Iran because, under the Constitution, he is required to obtain prior approval from Congress to commence a war. At a fundraising event, he stated that "I won't use the word 'war' because they say, if you use the word war, that's maybe not a good thing to do. They don't like the word 'war,' because you're supposed to get approval, so I'll use the word 'military operation,' which is really what it is." Separately, defendant has also asserted that the Iran war is an "excursion" and a "war," and when asked about the discrepancy responded, that "it's both. It's an excursion that will keep us out of a war."

27. Defendant's war against Iran has caused a civilian catastrophe in Iran. As corroborated by independent international organizations, civilian death tolls across the first 39 days

of the war ranged between 1,030 and 2,362 — with the true figure difficult to determine given Iran's internet blackout. Between 254 to 376 children are confirmed among the dead, and over 26,500 individuals have been injured. In addition, millions of Iranians have been displaced by the war, with more than 125,000 residential units damaged and destroyed in the ongoing unconstitutional war of aggression conducted by defendant.

28. Defendant's war against Iran has continued to date. On September 9, 2026, defendant stated that "I think the war's going to end immediately after the election because they can't hold out any longer." On September 22, speaking before the United Nations, the defendant suggested he had the sole discretion and will soon choose whether he will "annihilate" Iran, or instead decide to strike a deal.

**PLAINTIFF'S CLAIM**

29. The Declare War Clause entrusts to Congress the exclusive authority for taking the nation from a state of peace to a state of war. Abraham Lincoln explained in a February 15, 1848 letter to William H. Herndon: "The provision of the Constitution giving the war-making power to Congress, was dictated, as I understand it, by the following reasons—Kings had always been involving and impoverishing their people in wars, pretending generally, if not always, that the good of the people was the object– This, our convention understood to be the most oppressive of all Kingly oppressions; and they resolved to so frame the Constitution that no one man should hold the power of bringing this oppression upon us…." Despite this requirement for Congressional authorization for the United States to initiate this war, defendant has unilaterally ordered the Armed Forces of the United States to wage an unconstitutional criminal war of aggression against the Islamic Republic of Iran, as more fully set forth above, without authorization of Congress. Indeed, the House and Senate, acting concurrently, have voted against the war.

30. Absent a declaration from this Court that defendant's continuing presidential war of aggression violates the Constitution, the war will continue indefinitely and will cause imminent threats to the lives, limbs, health, property, and bare necessities of all Iranians, including those whose families are members of plaintiff NIAC Action. Such a declaration would reasonably likely dispel the imminent harms alleged because defendant can be expected to comply with such a judgment. As President of the United States, he is legally obligated by Article II, section 3 of the Constitution, which includes the duty to take care that the laws and Constitution of the United States be faithfully executed, including the duty to comply with final judgments of the courts of the United States.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays that the Court enter an order:

A. Declaring that the defendant is unconstitutionally waging an indefinite war of aggression against the Islamic Republic of Iran;

B. Awarding plaintiff its costs and attorneys' fees as provided by law; and

C. Awarding plaintiff such further relief as may be just and proper.

Dated: September 24, 2026

Respectfully submitted,

/s/ Alan B. Morrison
Alan B. Morrison (D.C. Bar No. 073114)
2000 H Street NW
Washington, D.C. 20052
(202) 994-7120
abmorrison@law.gwu.edu

/s/ Bruce Fein
Bruce Fein (D.C. Bar No. 446615)
Law Offices of Bruce Fein
300 New Jersey Avenue, N.W., Suite 300
Washington, D.C. 20001
(202) 465-8728
Bruce@feinpoints.com

*Counsel for Plaintiff*